```
           IN THE UNITED STATES DISTRICT COURT FOR THE
                   EASTERN DISTRICT OF ARKANSAS
                        WESTERN DIVISION

BARRY J. JEWELL,                      )
                                      )
          Plaintiff,                  )
                                      )
     v.                               )   No. 4:06-cv-684-RSW
                                      )
UNITED STATES OF AMERICA,             )
                                      )
          Defendant.                  )
```

**Memorandum Opinion and Order**

The parties have filed cross motions for summary judgment under Fed R. Civ. P. 56. The parties agree on the material facts but disagree on the legal significance of those facts. Because Plaintiff has proven as a matter of law the IRS's actions were improper and incorrect, the Court **GRANTS** his motion for summary judgment and **DENIES** the United States' motion.

**I.   Facts**

Jewell was a shareholder in the law firm of Jewell, Moser, Fletcher & Holleman, P.A. ("JMFH"). JMFH was the sponsor of four employee-benefit prototype plan documents ("the prototype plans"), which it provided to its clients. After legislation from 1994 to 2000 commonly referred to as "GUST,"[1] JMFH was

---

[1] "GUST" refers to the following legislation:

1. The Uruguay Round Agreements Act, Pub. L. 103-465 ("GATT");
2. The Small Business Job Protection Act of 1996, Pub. L. 104-188 ("SBJPA") (including § 414(u) of the Internal Revenue Code (Code) and the Uniformed Services Employment and Reemployment Rights Act of 1994, Pub. L. 103-353 (USERRA));

1

required to amend the prototype plans to comply with GUST. Although no concrete deadline to amend prototype plans was set, the Internal Revenue Service ("IRS") granted an extension of the remedial amendment period for employer plans as long as the employer adopted a prototype plan that was amended by December 31, 2000. Rev. Proc. 2000-20, 2000-6 I.R.B. 553. The IRS set the remedial amendment period for employer plans as February 28, 2002, or the last day of the first plan year beginning on or after January 1, 2001, whichever occurred last. See Rev. Proc. 2000-27, 2000-26 I.R.B. 1272; Rev. Proc. 2001-55, 2001-49 I.R.B. 552. JMFH submitted its amended prototype plans on February 5, 2002. The IRS requested corrections on July 25, 2002. Jewell alleges the corrections were not substantive. He made the corrections and resubmitted the prototype plans on July 26, 2002.

On July 26, JMFH stopped conducting regular business -- the day Scott Fletcher left the firm (doc. # 16). Shortly after, the other attorneys, Jewell, Keith Moser, and John Holleman also left the firm, and each began their own practice. A Pulaski County Circuit Court order entered in JMFH's state dissolution proceeding indicates that each attorney took their own client files and accounts receivable, leaving the JMFH firm with very few assets (doc. # 16). This dissolution proceeding is ongoing.

---

3.  The Taxpayer Relief Act of 1997, Pub. L. 105-34 ("TRA '97"); and
4.  The Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206 ("RRA").

2

On October 4, 2002, the IRS responded with additional questions regarding the prototype plans. Jewell made those corrections on October 7. On October 9, the IRS issued opinion letters, approving the prototype plans. The letters state, "Because you submitted this plan for approval after December 31, 2000, the remedial amendment extension period of section 15 of Rev. Proc. 2000-20, 2000-6 I.R.B. 553 is not applicable." (doc. #20-4).

Prior to the IRS's requests for changes, JMFH began submitting individual employer plans for determination letters. Jewell's clients adopted the prototype plans before or within two and a half months of their plan year end, and Jewell submitted them to the IRS for favorable determination letters. At oral argument on the summary judgment, the United States conceded these initial employer plans were timely submitted within the remedial amendment period. After the IRS issued its opinion letters for the prototype plans, Jewell updated his employer plans and resubmitted an adoption agreement incorporating the updated prototype plans. The United States contends that this re-submission proves the earlier filed employer plans did not comply with GUST and thus made the plans "late amenders."

In 2003, two IRS agents, Lori Kay and Rick Parker, began reviewing the employer plans for determination letters. Compl. Exh. A-2. Kay contacted Jewell and informed him they were "late amenders" because of the deficiencies noted in the prototype plans and included in the employer plans. Id. Jewell contested

the allegation but discussed the possibility of an umbrella closing agreement that would protect the employers from any interruption of their plans.  Compl. Exh. A-3.  Jewell's and Kay's correspondence was heated at best, and although a closing agreement was negotiated, no agreement seemed likely.

On December 4, 2003, Moser and Holleman filed an IRS Form 2848 power of attorney with the IRS and "revoked" Jewell's authority to negotiate with the IRS.[2]  Compl. Exh. A-13.  Moser and Fletcher then negotiated a closing agreement ("the agreement") with the IRS under 26 U.S.C. § 7121 on behalf of JMFH and Fletcher's solo firm.  Under the agreement, JMFH would pay a penalty of $26,800 and the prototype plans would be considered filed prior to December 31, 2000, thus availing the employer plans to the extension allowed under Revenue Procedure 2000-20 and making the employer's filing timely.  The agreement stated it was a final agreement except in the event of fraud, malfeasance, or misrepresentation of material fact.  Compl. Exh. A-20.  According to Jewell, Kay and Parker threatened that if Jewell removed his clients from consideration under the agreement and did not pay his share of the agreement, the IRS would not enter into the agreement with JMFH, Jewell could face lawsuits from Moser's and Fletcher's clients, and the IRS would conduct individual investigations of each of Jewell's employer plans.

---

[2] Jewell contends this action was a violation of Arkansas corporate law regarding shareholder meetings.  Compl. Exh. A-16.  The Court does not believe this issue is relevant to address the case and will not decide it.

4

Jewell concluded he had no choice but to pay his portion.  Moser and Fletcher executed the agreement on behalf of JMFH.  Jewell did not sign the agreement.  The penalty was paid with three certified checks:  Moser & Associates paid $8,933.34, Fletcher Law Firm P.A. paid $8,933.33, and Jewell personally paid $8,933.33.  In the cover letter that Jewell attached to his check and sent to Moser, Jewell stated he paid the penalty under protest.  Compl. Exh. A-17.  After the penalty was paid, Jewell brought this refund suit for $8,933.33.

**II.  Discussion**

    **a.  Standard of Review**

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is "material" if it might affect the outcome of a case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986).  The non-movant "must show there is sufficient evidence to support a jury verdict in [his] favor."  Nat'l Bank of Commerce v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir. 1999).  The court views the facts and the inferences to be drawn from the facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**b.   Standing**

The Court has previously addressed standing in its order to the United States' motion for dismissal (doc. # 21). While the closing agreement was negotiated for JMFH and while a shareholder does not usually have standing to claim a corporation's cause of action, this case presents the unique situation where the firm had gone through a de facto dissolution and distribution, and Jewell was forced to personally pay the penalty. He was a taxpayer who suffered a direct harm. Therefore, under Arkansas law, he has standing to challenge the United States' actions.

**c.   Timeliness and Fraud, Malfeasance, or Misrepresentation**

In order to prevail on his summary judgment motion, Jewell must prove two things:

1.   The agreement was induced by fraud, malfeasance, or misrepresentation of material fact; and

2.   His employer plans were timely filed.

Both parties agree on the facts. Therefore, this case is ripe for the Court to conclude the legal significance of those facts.

First, Jewell must prove the agreement was induced by fraud, malfeasance, or misrepresentation of material fact. Under 26 U.S.C. § 7121(b), closing agreements are the final resolution of the dispute and may be reopened only in certain cases of fraud, malfeasance, or misrepresentation of a material fact:

> (b)  Finality.--If such agreement is approved by the Secretary (within such time as may be stated in such agreement, or later agreed to) such agreement shall be final and conclusive, and, except upon a

6

>     showing of fraud or malfeasance, or
>     misrepresentation of a material fact--
>     (1) the case shall not be reopened as to the
>         matters agreed upon or the agreement modified
>         by any officer, employee, or agent of the
>         United States, and
>     (2) in any suit, action, or proceeding, such
>         agreement, or any determination, assessment,
>         collection, payment, abatement, refund, or
>         credit made in accordance therewith, shall
>         not be annulled, modified, set aside, or
>         disregarded.

In cases of misrepresentation of a material fact, the misrepresentation must go to "the essence of the agreement." In re Miller, 174 B.R. 791, 796 (B.A.P. 9th Cir. 1994). Mistakes of fact or law, no matter if unilateral, mutual, or how material, are insufficient to establish a misrepresentation. Id. at 797 (citing Andrews v. United States, 805 F. Supp. 126, 130 (W.D.N.Y.1992)). In general, "malfeasance" is a "wrongful or unlawful act; esp. wrongdoing or misconduct by a public official." Black's Law Dictionary 946 (8th ed. 2004).

Jewell suggests seven allegations of fraud, malfeasance, or misrepresentation of material fact. The Court is persuaded by only one: the alleged threat Agent Kay made regarding the employers. In her letter of May 23, 2003, after suggesting it may be to Jewell's benefit to negotiate an umbrella closing agreement, Kay stated that if a closing agreement was rejected or unsuccessfully negotiated, the IRS would proceed with an individual determination letter process for each employer as late amenders (Compl. Exh. A-2). Agent Parker, in his letter on behalf of Agent Kay dated August 22, 2003, discussed the proposed

7

penalty and noted it would avoid "the harsh tax consequences of plan disqualification that would potentially be incurred by hundreds of employers, most of whom are very small entities . . . ." (Compl. Exh. A-6).  Thus, the IRS presented Jewell and JMFH with a Hobson's choice:  either accept the closing agreement and pay a penalty or subject its clients to individual plan evaluations as "late amenders," submitting them to the harsh consequences of disqualification, penalty, or both.  As a law firm, JMFH had an ethical obligation to act in its clients' best interests, or in other words, accept a closing agreement and pay a penalty, whether rightfully deserved or not.  The lack of any true options took away any negotiation position Jewell and JMFH may have had. This conduct is extortionary, deplorable, and wrong.  Our government cannot be allowed to act in this manner.  Kay's and Parker's conduct amounts to fraud or malfeasance and justifies the setting aside of the closing agreement.

Having proven fraud or malfeasance by the IRS, the Court now moves to the issue of timeliness.  Jewell calculated the end of the plan year, which is also the fiscal year end, for each employer and most employers adopted an amended JMFH plan within two and a half months of the plan-year end (docs. # 33, #37).  <u>See</u> 26 C.F.R. § 1.401(b)-1(d)(2) (the remedial amendment period ends the latest of the time prescribed by law for filing the employer's income tax return or the end of the plan year); Rev. Proc. 2000-27, 2000-26 I.R.B. 1272 (setting the GUST remedial amendment period as the last day of the first plan year beginning

on or after January 1, 2001); Rev. Proc. 2001-55, 2001-49 I.R.B. 552 (extending the first day of the remedial amendment period to February 28, 2007). At oral argument, the United States conceded Jewell timely submitted his initial employer plans for determination letters. The United States has partially retreated from this concession through a supplemental declaration of Agent Kay that the Court requested (doc. #37). Both supplemental exhibits the parties submitted indicate a great majority of the plans were timely (doc. #33, #37). Most of those plans that seem to have been late were late by only a few days. However, as the Court discusses further below, the plans that were submitted, whether late or not, were substantially correct. This good faith, quality submission mitigates the need for an IRS imposed penalty.

The United States also contends Jewell's filings became untimely when he filed a second adoption agreement for each employer plan incorporating the changes that led to the October 9, 2002, prototype plan opinion letters. It argues that filing a second adoption agreement proves the employer plans did not comply with GUST.

Jewell argues that the first plans filed were a bona fide, good faith, submission to comply with GUST, noting language from a later revenue procedure that again extended the GUST remedial amendment period, and that he should not be punished for making minimal changes the IRS requested. Revenue Procedure 2003-72 states the IRS will allow employers to change their plans after

the remedial amendment period ends as long as their first submission was "a <u>bona fide</u> effort to comply with the requirements of GUST . . . ."

> .01 A plan satisfies the timely amendment requirements of this section 5 if the plan is amended to comply with GUST within the plan's GUST remedial amendment period. For this purpose, a <u>plan will be treated as having been amended to comply with GUST</u> within the plan's GUST remedial amendment period <u>if plan amendments that represent a bona fide effort to comply with the requirements of GUST have in fact been adopted</u> (that is, they are not in proposed form) by the end of the plan's GUST remedial amendment period (determined without regard to § 1.401(b)-1(e)(3)).
>
> .02 For purposes of this section, <u>bona fide amendments that are adopted by the end of the GUST remedial amendment period</u> that are made contingent on the receipt of a favorable determination letter <u>will be considered adopted by that date</u>, provided such amendments become effective (or would become effective, but for the Service's request for changes to the amendments or additional amendments) upon receipt of a favorable determination letter without further action by the plan sponsor.
>
> .03 <u>The Service recognizes that employers may discover, after the expiration of the GUST remedial amendment period, that changes to their amendments or other amendments may be needed</u>. Similarly, <u>the Service may request changes</u> to amendments that employers submit or additional amendments in connection with determination letter applications. The fact that, in connection with the determination letter process, the employer adopts or submits in proposed form, or the Service requests, <u>such changes or such additional amendments will not mean that the amendments the employer adopted by the end of the GUST remedial amendment period did not represent a bona fide effort to comply with the requirements of GUST</u>.

Rev. Proc. 2003-72 § 5, 2003-38 I.R.B. 578 (emphasis added).

The United States argues Jewell cannot rely on that revenue procedure because Jewell could not take advantage of the extension allowed under it.  While the United States is correct

10

that the technical extension under Rev. Proc. 2003-72 did not apply to Jewell, the revenue procedure also makes a logical statement of IRS policy.  An employer may submit a plan to the IRS, believing it complies with GUST.  However, the IRS may notice minor items that need correcting, and the IRS justifiably may ask the employer to make changes.  However, that does not mean the plan was so deficient or late that it should be disregarded or subjected to a hefty penalty.  The employer has fulfilled its duty to submit a good-faith plan it believes complied with GUST.  The IRS's position as final grader does not mean the employer's plan was late if minor mistakes are found.

   The situation is similar to a law-school student who submits a writing assignment to her professor by the due date.  The professor, while grading the paper, notices some grammar and citation mistakes.  The professor also disagrees with some of the legal analysis.  While the mistakes may effect the student's overall grade, the paper is not late.

   Furthermore, the United States' argument that Jewell cannot rely on Revenue Procedure 2003-72 is somewhat illogical.  Revenue Procedure 2003-72 extended the remedial amendment period again and added a bona fide policy for certain employers who had fourth-quarter plan years.  In essence, the IRS extended lenity to some employers but punished Jewell's employer clients even though they had submitted a basic and nearly complete plan.  What common sense supports this conclusion?  It is an illogical and inequitable conclusion that cannot stand.

11

This bona fide amendment policy is not new to the IRS. After the Tax Reform Act of 1986, prototype plan sponsors and employers had to make similar large scale amendments to their plans. In setting the remedial amendment period for the Tax Reform Act, the IRS allowed for employers to make bona fide plan submissions that may have to be later changed:

> (2) An <u>employer will satisfy the requirement</u> in section 4.02(1)(b) provided the amendments adopted by the end of the TRA '86 remedial amendment period <u>represent a bona fide effort to comply with all of the requirements of TRA '86</u>. Further, <u>bona fide amendments that are adopted</u> by the end of the TRA '86 remedial amendment period that are made contingent on the receipt of a favorable determination letter <u>will be considered adopted by that date</u>, provided such amendments become effective (or would become effective, but for the Service's request for changes to the amendments or additional amendments) upon receipt of a favorable determination letter without further corporate action.
>
> (3) <u>The Service recognizes that employers may discover, after the expiration of the TRA '86 remedial amendment period, that changes to their amendments or other amendments may be needed to satisfy TRA '86</u>. This might occur, for example, in the process of preparing (or analyzing data for) the determination letter application. Similarly, <u>the Service may request changes</u> to amendments that employers submit or additional amendments in connection with determination letter applications. The fact that, in connection with the determination letter process, the employer adopts or submits in proposed (unadopted) form, or the Service requests, <u>such changes or such additional amendments will not mean that the amendments the employer adopted by the end of the TRA '86 remedial amendment period did not represent a bona fide effort to comply with all of the requirements of TRA '86</u>.

Rev. Proc. 95-12 §4.02, 1995-3 I.R.B. 24.

Furthermore, this policy is reflected in the IRS's acknowledgment it has received a determination letter request.

12

In the IRS's responsive correspondence, the IRS informs filers, "If additional information is required, or if other changes or plan amendments are needed, an Employee Plans Specialist will fax, phone, or write you . . . . You may typically expect to receive a determination letter after additional information and/or amendments are submitted." (doc. # 33, p. 20). This acknowledges the IRS may ask for changes but says nothing about these changes making the submission untimely. The IRS cannot be allowed to accept timely adoptions, ask for minor changes to those adoptions, and then declare the plan late and demand a penalty when the employer makes the IRS-requested changes.

During oral argument, the United States conceded that the employer plans Jewell submitted were a bona fide effort to comply with GUST. In fact, one of the changes the IRS requested (numbered 2B in the briefs) was its own fault because of inaccurate advice given to Jewell earlier. These good-faith submissions entitle these employers to rely on their timely submission after the IRS requested changes. Therefore, Jewell's plans were timely submitted and made in good faith. Jewell and his clients should not be punished for making minor changes the IRS requested. The majority of the plans were not "late amenders," and Jewell should not be subjected to a penalty.

The United States argues any bona fide efforts to comply with GUST can only be considered when examining the amount of the penalty under the Correction on Audit Program ("Audit CAP").

This ignores the IRS's own policy discussed above that changes made at the IRS's request will be treated as being timely filed.

Put simply, this case presents a hyper-technical issue of timeliness.  Most of the employer plans in danger in this case are long standing and a good-faith submission amending the plan was made, giving the IRS the basic plan with only a few errors.  No common-sense or legal purpose is served by disqualifying or punishing employers or sponsors who had complied in good faith with the IRS's request.  While Jewell should have been more diligent in amending JMFH's prototype plans so he could avoid this concern altogether, his clients and JMFH should not have been subjected to a penalty.

### III. Conclusion

No genuine issues of material fact exist in this case. Jewell's motion for summary judgement is **GRANTED**, and the clerk of district court is ordered to enter judgment in favor of Jewell for $8,933.33, his portion of the penalty paid.  Jewell is also awarded pre-judgment interest from the date of the payment of his portion of the penalty (December 22, 2003) until the date of judgment at the appropriate rate for tax refund suits, post-judgment interest at the established federal rate on the date of judgment, and costs.  The parties shall bear their own attorney's

fees.  The United States' cross motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

Dated this 19th day of November, 2007.

_____
RODNEY S. WEBB  District Judge
United States District Court